**E-FILED**
Tuesday, 22 July, 2008  09:19:47 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TOBY L. BASIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07-CV-3215 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Toby Basil appeals from a final decision of the Social Security Administration (SSA) denying her application for Supplemental Security Income (SSI) under chapter XVI of the Social Security Act, 42 U.S.C. §§ 423(d) and 1382c, and Disability Insurance Benefits (DIB)  under the Social Security Act, 42 U.S.C. §§ 416(I) and 423, for the period from January 31, 2004 forward.  Basil brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have consented to a determination of this case by United States Magistrate Judge, pursuant to 28 U.S.C. § 636.  Order, dated February 15, 2008 (d/e 13).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  Plaintiff's Motion for Summary Judgment (d/e 11); Defendant's Motion for Summary

Judgment (d/e 15).  For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence.  The SSA's Motion for Summary Judgment is therefore allowed, and Basil's Motion for Summary Judgment is denied.

STATEMENT OF FACTS

A.   Medical History

Basil was born March 14, 1963.  She has an 11th grade education and has obtained a GED.  She has past relevant work as a certified nursing assistant (CNA), customer service representative, personal assistant, and warehouse technician.

Basil suffers from fibromyalgia, depression, impairments of the cervical spine, asthma, arthritis, joint and muscle pain, and migraines, among other things.  From January 2001 through February 2002, Basil was treated by Susan Hingle, M.D. for her fibromyalgia.  Administrative Record (d/e 9) (A.R.) at 213-31.  In May 2001, Basil was treated in the emergency room for muscle pain throughout her body and a headache.  At this time, Basil stated that she had been diagnosed with fibromyalgia, and she reported a history of depression as well.  A.R. at 206-07.  The ER doctor gave Basil 60 mg of Toradol, which brought significant relief of the

headache and muscle pain.  Basil was discharged with instructions to continue with her prescribed medication and to see her doctor.  Basil visited Dr. Hingle in June 2001, September 2001, and November 2001, as well as February and March of 2002.  In March 2002, Basil stated that she was achy and tired and unable to work due to pain.  Basil reported that she was able to get some relief through aquatherapy.  A.R. at 213.  Dr. Hingle noted no loss of function, but multiple tender points.

Basil's primary physician is Dr. Lisa Benning.  The record contains medical records from Dr. Benning beginning in 2000.  A.R. at 260-84. Dr. Benning treated Basil's complaints of neck pain with various prescription pain relievers.  Id.  Basil was also treated by Dr. David Gelber, a neurologist.  Basil began seeing Gelber in November 2001 and had regular follow-up appointments for fibromyalgia thereafter.  A.R. at 352-63. In March 2003, Gelber noted that, overall, Basil was doing well.  He specifically noted that she was ambulatory most of the time without an assistive device, although she did use a cane when the pain was worse or it was slick outside.  A.R. at 356.  In February 2004, Dr. Gelber noted that Basil was doing "reasonably well" and that her condition "has remained relatively stable."  A.R. at 354.  He noted that Basil's biggest problem was

affording her medications, due to her limited income, and that Basil was ambulatory with a cane.

Basil also received outpatient mental health care from Mental Heath Centers of Central Illinois in January 2003 and February and May 2004. A.R. at 247.  Basil reported depression resulting from the chronic pain she experienced due to cervical arthritis.  According to Basil, Lexapro helped ease these feelings, and the record reveals that Basil was directed to continue with Lexapro.

In April 2004, Basil was treated in the emergency room for neck and right arm pain that began after she moved a desk.  A.R. at 232-46.  The emergency room doctor noted that Basil suffered from fibromyalgia and chronic back pain.  A.R. at 239.  An x-ray of Basil's cervical spine revealed mild spur formation at C4-5 and C5-6 with some mild bilateral foraminal narrowing but no other abnormality.  A.R. at 241.  The doctor diagnosed Basil with a pinched nerve in her neck and directed her to treat it with rest, heat, massage, and non-prescription pain medication.  Basil was also directed to follow up with Dr. Benning.

In May 2004, Basil again presented to the emergency room, complaining of lower back pain that started abruptly when she tried to pick something up off of the floor.  A.R. at 249-59.  Basil was treated with prescription pain medication and released in stable condition.  Basil was referred to Sheila M. Ayorinde, M.D. for follow up.

In June 2004, Dr. Ayorinde ordered an MRI of Basil's cervical spine which revealed degenerative changes that were in some places moderately severe.  A.R. at 285, 313-14.  Also in June 2004, Basil was examined by Vittal V. Chapa, M.D. in connection with her claim for benefits.  A.R. at 315-18.  Dr. Chapa noted that Basil could ambulate up to fifty feet on a flat surface without a cane, had good bilateral hand grip, and could perform both fine and gross manipulations with both hands.  According to Chapa, a straight leg raising test performed sitting was negative up to seventy-five degrees bilaterally and Basil had full range of motion of the hip and knee joints as well as the cervical spine and shoulders.  Chapa found no evidence of lumbar radiculopathy.

Basil returned to Dr. Gelber for follow-up in July 2004.  A.R. at 353.  Gelber discussed the MRI with Basil and noted that she was not interested in a surgical evaluation at the time.  According to Gelber, Basil's "strength

was normal and her gait was steady." Id.  Gelber concluded that overall Basil seemed to be managing reasonably well, although she remained concerned about ongoing pain and spasms.    Also in July 2004, Kirk Boyenga, Ph.D., a state agency psychologist, reviewed Basil's medical records and assessed her mental functioning on a Psychiatric Review Technique Form.  A.R. at 287-304.  According to Boyenga, none of Basil's impairments met the listing criteria.  He opined that Basil had moderate restriction of activities of daily living and mild restriction in social functioning and in maintaining her concentration, persistence, or pace.  Boyenga concluded that Basil had an affective disorder revolving around her physical problems.  According to Boyenga, Basil was capable of performing simple tasks and although her social skills were impaired, she could function in settings with reduced interpersonal contact and maintain friendships.  Boyenga opined that Basil could perform routine, repetitive tasks, as indicated by her ability to follow instructions and travel independently.

In October 2004, Basil returned to Dr. Gelber.  Gelber characterized Basil as "doing about the same."  A.R. at 352.  He noted that she walked with a cane, no longer did much driving, and required help to shower due to

her pain.  Gelber found that Basil exhibited strength of 4/5 throughout

limited by pain and that her gait was steady with a cane.  Dr. Gelber

completed an SSA Listing of Impairments for Basil.[1]  A.R. at 370-73.

Gelber indicated that Listing § 1.04 did not apply,  but opined that Basil met

Listing § 1.02 based on major dysfunction of a joint.  Gelber did not indicate

which medical findings Basil had satisfied for this listing.

Basil visited Dr. Benning several times in 2005, for examinations

relating to back pain, asthma, coughing, and oral thrush.  A.R. at 397-403.

In July 2005, Basil returned to Dr. Gelber for follow up and reported

increased pain and muscle spasms, numbness in her right arm, and

tingling in her right leg.  A.R. at 433.  Basil reported that she was able to

stand or walk for only up to half an hour before the pain becomes

unbearable.  Basil stated that she was having trouble sleeping due to

muscle spasms.  Gelber noted that Basil exhibited strength of 4+/5

throughout and a steady gait, but characterized her fibromyalgia symptoms

as "worsening."  Id.  Dr. Gelber referred Basil for an EMG-nerve conduction

---

[1]The Court notes that Basil's Motion for Summary Judgment states that this Listing bears the date of October 18, 2007.  Although difficult to decipher, the Court believes that the document is actually dated 10-18-04.  In reaching this conclusion, the Court notes that the document bears a file stamp from claimant's attorney's office with the date of October 21, 2004, and a file stamp from the Office of Hearings and Appeals dated March 22, 2005.  Additionally, the document was part of the record before the ALJ, whose decision was entered in January 2007.

study to evaluate her for possible cervical radiculopathy based on Basil's new complaints of numbness in her right arm.  A.R. at 431-32.  The study revealed mild, chronic right C6 radiculopathy suggestive of nerve root irritation, but there was no evidence of carpal or cubital tunnel syndrome or peripheral neuropathy.  Gelber recommended epidural steroid injections, to which Basil was agreeable.

Basil returned to Dr. Gelber in January 2006, reporting that her pain had worsened and she had difficulty sleeping due to muscle spasms.  A.R. at 429.  Basil reported that she was taking college classes but had difficulty walking with her cane due to fatigue, pain and spasms.  Gelber noted that Basil's gait was slow with her cane.  Gelber adjusted Basil's medication and referred her for an evaluation for a motorized scooter or chair.  It appears from the record that Gelber had some part in a March 10, 2006 letter by Basil's therapist seeking funding for a wheelchair, although the copy of the letter in the record is unsigned.  A.R. at 377-78.  According to the March 10th letter, it was anticipated that Basil would spend five or six hours a day in a wheelchair, if one were allowed.  A.R. at 377.

In late March or early April 2006, Dr. Gelber examined Basil, who reported that she was doing "a bit worse."  A.R. at 428.  Gelber noted that Basil's strength and reflexes were normal and her gait was steady with a cane.   In April 2006, Gelber completed another SSA Listing of Impairments for Basil.  A.R. at 383-84.  Again, Gelber opined that Listing § 1.04 did not apply.  A.R. at 383.  The April 2006 Listing does not address any other listing.  Gelber, however, did place a check mark next to the portion of the form that defines Loss of Function as set forth in § 1.00B2b, and indicated that Basil's impairment met this category.  A.R. at 383-84.  Gelber noted that he could not objectively comment on any sedentary restrictions that Basil might have and recommended that a functional capacity analysis be performed.  A.R. at 381.  Gelber opined that the level at which Basil could perform sustained work was "[l]ess than sedentary."  A.R. at 385.

In June 2006, Basil saw Dr. Chauncey Maher at the Mental Health Centers of Central Illinois.  A.R. at 455.  Basil reported that she did not do much other than watch television and "surf" on the computer.  Basil stated that she intended to enroll in at least twelve hours of college classes in the fall, because the state rehabilitation service would only continue to support

her education if she was enrolled full time.  Dr. Maher suggested that Basil try doing some reading over the summer to improve her reading retention; however, Basil was "rather dismissive" of this idea.  Id.  Maher decided to continue Basil on 20 mg of Lexapro.

In July 2006, Basil was assessed for a treatment plan at the Mental Health Centers of Central Illinois.  Basil's diagnosis was set forth as major depression of recurrent and moderate severity, generalized anxiety, cannabis abuse for pain control, and alcohol abuse in partial remission.  She was assigned a GAF/CGAS of 40.[2]  A.R. at 417.  Basil also visited Dr. Gelber on July 24, 2006.  A.R. at 426.  Gelber noted that Basil had been "doing reasonably well since [he] last saw her," and that she now had a power wheelchair which allowed her "to get around well."  Id.  Gelber noted strength of 4/5 throughout and stated that Basil was stable on her current treatment plan.

In August 2006, Basil returned to Dr. Benning and reported an episode of possible seizure activity and sleepwalking.  A.R. at 390.

---

[2]GAF is an assessment of an individual's overall level of psychological, social and occupational functioning which is used to make treatment decisions.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32 (4th ed. 2000).  Scores range from 0 to 100, with lower numbers indicating more severe mental limitations.  Id. at 34.

Benning ordered a CT scan of Basil's head, which revealed no abnormalities.  A.R. at 404.

On October 10, 2006, Dr. Benning completed an SSA Listing of Impairments, indicating that Basil's degenerative disease of the cervical and lumbar spine together with her fibromyalgia prevented her from effectively walking any distance.  A.R. at 422.  Benning concluded that Basil's impairment met category § 1.04 of the SSA listing of impairments, specifically "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive strait-leg raising test (sitting and supine)."  A.R. at 421.  Benning opined that Basil could not stand, lift, or walk for even one hour at a time, and that she could sit for only one hour at a time.  A.R. at 423.  According to Benning, Basil could sit up to two hours in an eight-hour day, but could not stand, lift, or walk for even one hour.  Id.  Benning placed the following restrictions on Basil's ability to work: no work at unprotected heights, no work around moving machinery, no exposure to marked changes in temperature and humidity, no driving of automotive equipment,

and no exposure to dust, fumes, or gases.  A.R. at 424.  Benning opined that the level at which Basil could perform sustained work was "[l]ess than sedentary."  A.R. at 425.

B.    Administrative Hearing

On April 13, 2004, Basil applied for SSI and DIB.  Basil alleged disability beginning January 31, 2004.  Her claims were denied initially and on reconsideration on December 28, 2004.  On January 7, 2005, Basil filed a timely request for an administrative hearing.  The Administrative Law Judge (ALJ), Barbara J. Welsch, presided over a video hearing on October 17, 2006. Basil appeared with counsel.  The ALJ heard testimony from Basil and Ronald Malik, a vocational expert.

Basil testified that she has chronic pain and that the medication she takes only "brings the pain down a little bit."  A.R. at 497.  She stated that she has numbness and pain down her arm and also down her lower back and right leg, making it difficult to walk.  Basil cited swelling in her ankles, feet, and hands.  She testified that she gets overly tired and sick unpredictably, requiring bed rest.  Additionally, though Basil herself has no memory of the incident, she stated that according to her roommate, she went into a seizure after falling asleep in front of a computer.  Basil testified

that she has had suicidal thoughts but has never acted on them; she stated that she has no hallucinations or paranoia.  In addition to taking three Vicodin a day, she smokes marijuana "maybe two times a day," for pain control, despite her counselor's warning that marijuana could cause problems with memory and concentration.  A.R. at 499.  Basil also smokes a pack of cigarettes daily, although she testified that her doctor wanted her to quit.  A.R. at 505-06.

Basil testified that due to her pain, she has difficulties with many daily activities.  She stated that she has trouble walking unassisted or even with a cane, and has great difficulty climbing stairs.  Basil stated that after ten or fifteen minutes of continuous sitting or standing, she begins to experience pain in her lower back.  Responding to the ALJ's questioning, Basil estimated that after "maybe two" hours of a job which allowed her to alternate sitting and standing, she would "get extremely uncomfortable and . . . have to lay [sic] down."  A.R. at 512.  Basil estimated that she spent at least twelve or thirteen hours lying down each day.  She also reported using a power-assisted wheelchair, rather than a self-propelled one, due to the fact that she would be unable to propel herself due to pain in her shoulder and arm.  Basil indicated that she has trouble lifting and holding

items and also has difficulty putting on socks and shoes. She reported troubles maintaining her personal hygiene unaided. Basil stated that she had a driver's license, but that she has limited ability to drive an automobile. She testified that she finds her current full-time college class schedule to be overwhelming at times and that she has trouble finishing small tasks that she begins, including working on the computer. She also reported experiencing problems with anxiety and depression.

At the time of the hearing, Basil was in her third semester at college. The first two semesters, she took only two courses, but Basil reported that she was taking four courses in her third semester. She stated that she was only taking this course load because the Department of Rehabilitative Services told her "they would not deal with [her] unless [she] was going full time." A.R. at 515. She testified that she was really struggling with this course load. Basil testified that on Mondays, Wednesdays, and Fridays, she has classes at 9:00 a.m., 10:00 a.m., 11:00 a.m., and 2:00 p.m., with a two-hour laboratory on Thursdays. According to Basil, after the 11:00 class, she would "hit the Women's Center and sleep" before her 2:00 class. A.R. at 501. In the approximately two months of the semester that had passed at the time of the hearing, Basil testified to having missed two days

of school due to her pain.  At school, she indicated that she is the president of a student organization called The Alliance, which has "about four or five [members]."  Id. at 503.  She stated that, in this role, she moderates bi-weekly meetings.

In addition to attending school, Basil testified to doing a small amount of grocery shopping.  She stated that she only went on short trips to "get ten things," and that she uses the shopping cart to steady her gait.  A.R. at 507.  In 2005, Basil went to Florida with her partner and roommate, Jeanette, in order to see Jeanette's children.  Basil stated that she took a plane to Florida and that the trip lasted two weeks.

Basil testified that in approximately the last two decades, she held a variety of jobs, including personal attendant, CNA, and work for cable and telephone companies.  She stated that she has been in nursing "off and on for 18/19 years" and that her most recent job was as a personal attendant working for the Illinois Department of Rehabilitative Services.  A.R. at 492.  Basil reported working as a CNA for the Mother House of the Hospital Sisters.  Basil also worked for Cingular, where her job was "basically a sit down telephone job."  A.R. at 493.  She also stated that she worked for a cable company for several years, initially visiting customers' houses to set

up electronics and later working in the warehouse, ordering and issuing

supplies.

Vocational expert Ronald Malik also testified.  The Judge first asked

Malik to consider

> an individual who has past relevant work experience as . . .
> outlined [in Basil's testimony] . . .  An individual who is limited to
> light and sedentary work with the . . . following exceptions.  No
> jobs which would require climbing or working at unprotected
> heights.  No jobs which would require prolonged walking.  How
> would these restrictions affect the performance of past relevant
> work?

A.R. at 519.  Malik testified that with those restrictions, Basil could return to

past work of customer service and phone-service sales.  The ALJ then

asked Malik to consider further restrictions limiting jobs to routine and

repetitive work.  Malik stated that such restrictions would eliminate all of

Basil's past relevant work.

The ALJ next asked Malik to give examples of jobs which were "light

and sedentary work" and also unskilled and repetitive in nature.  A.R. at

520. Malik listed gate security, cashier, counter clerk, ticket checker, order

clerk, sedentary information clerk, and information clerk (at the light level)

as jobs fitting this description, totaling 58,333 positions in the state of

Illinois.  Malik further testified that all of those positions except cashier (which accounted for 39,420 of the available positions) would allow the employee to alternate between sitting and standing.  Malik stated that none of the positions would involve exposure to respiratory irritants, and that all positions except some of the gate guard positions would be able to accommodate a power wheelchair.  He also noted that the gate guard position could involve some exposure to heat and cold.

Basil's attorney examined Malik next, asking him how the enumerated positions would be affected by a number of hypothetical limitations.  Malik testified that most employers would not tolerate more than two unscheduled absences per month from an employee.  He also stated that most, but not all of the positions would be eliminated if a hypothetical individual needed to take more than the scheduled breaks throughout the day.  If an individual was limited to occasional contact with the public, Malik reported that all of the positions mentioned would be eliminated, but that there would be other jobs available.  Malik stated that an individual's limited ability to use her arms over her head would not affect the identified jobs.  Malik indicated that if an individual was limited to

"occasional fingering and handling with the right dominant hand," some of the cashiering jobs would be affected.  A.R. at 523. However, he clarified that there were cashier positions in video rental stores and convenience stores, in which, unlike grocery stores, the amount of items an individual scans would be relatively low.  Basil's attorney then asked how an employer would respond to an individual needing to lie down every two hours.  Malik stated that that would actually be acceptable, since this would coincide with typical break times: a 15-minute break in the morning, a half-hour lunch, and a 15-minute break in the afternoon.  The attorney's final hypothetical inquired about an individual whose treating physician indicated that the individual could sit for a maximum of two hours and stand for a maximum of one hour in an 8-hour day.  Malik responded that this would only total three hours, and thus would not constitute full-time employment.

C.    The ALJ's Decision

On January 16, 2007, the ALJ issued her decision, finding that Basil was not disabled from January 31, 2004 through the date of the decision. The ALJ reached her conclusion based on the five-step sequential evaluation process established by the SSA, which requires a determination of whether the claimant (1) is engaging in "substantial gainful activity"; (2) has a medically determinable impairment that is "severe"; (3) has impairments that meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"); (4) has the "residual functional capacity" to perform past relevant work; and (5) is able to do any other work considering the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. §§ 404.1520, 416.920(a)(4).  For the first four steps, the claimant bears the burden of proof and of providing evidence.  On the last step, however, the burden shifts to the SSA to prove that other work that the claimant can perform exists in sufficient numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.912(g).

The ALJ concluded that Basil met her burden at steps one and two of the analysis, but that she did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in Appendix 1 (step three).  The ALJ declined to give Dr. Gelber and Dr. Benning's opinions that Basil met a listing impairment controlling weight because they were not accompanied by medical findings to support the conclusions.  The ALJ noted that Dr. Gelber's diagnosis of fibromyalgia was accepted, but not his conclusions regarding Basil's degree of limitation, since they were based solely on Basil's objective statements made during her attempt to obtain disability benefits.  The ALJ acknowledged that claimant credibility does not typically enter into step three analysis, because this step is usually determined on the basis of objective medical evidence.  However, since the doctors' opinions were based on Basil's subjective statements and presentation regarding pain, weakness, etc., Basil's credibility was crucial at this juncture.  After considering all of Basil's impairments and all of the Listings, the ALJ concluded that Basil failed to demonstrate that her impairment was severe enough to equal an impairment listed on Appendix 1.

The ALJ then considered whether Basil retained the residual functional capacity to perform her past relevant work (step four) or other work existing in significant numbers in the national economy (step five).

She concluded that Basil retained the residual functional capacity to

perform light and sedentary work.  The ALJ specifically noted as follows:

> The contrast between what the claimant alleges she can not do,
> and what she actually does on a daily basis is marked and
> would suggest that she is far more capable than she presents.
> During a typical day, even at the time the sympathetic treating
> doctor was prescribing a power wheel chair, the claimant was
> attending classes which required walking, performing daily
> activities and otherwise demonstrating the ability to stand, walk,
> sit, lift light items and otherwise perform work-like duties.

A.R. at 22.  The ALJ then reviewed Basil's medical history and noted that

"[d]espite no change in medical findings, the claimant's subjective

complaints increased."  A.R. at 23.  With respect to mental limitations, the

ALJ concluded that the record as a whole "[did] not support more than

'slight' limitations in [Basil's] daily activities or social activities."  A.R. at 24.

The ALJ did, however, determine that Basil was limited to routine and

repetitive work.  Based on this limitation, the ALJ found, at step four, that

Basil was unable to perform past relevant work.

In her step five analysis, the ALJ addressed Basil's age, education,

work experience, and residual functional capacity as previously

determined.  The ALJ noted that Basil was classified as a younger

individual (age 18-44) with at least a high school education and the ability

to communicate in English.  Transferability of job skills was immaterial.

The ALJ cited the vocational expert's testimony which enumerated the many jobs available in Illinois at the light and sedentary level; she also identified jobs which would be ruled out based on Basil's limitations.  The ALJ further noted that none of the hypothetical limitations presented to the vocational expert by Basil's attorney's were supported by the record, and thus, the ALJ specifically rejected these limitations.  Based on Basil's age, education, work experience, and residual functional capacity, the ALJ concluded that Basil was capable of adjusting to other work that existed in significant numbers in the national economy.  Having applied the five-step analysis, the ALJ concluded that Basil was "not disabled" and, therefore, not eligible to receive SSI or DIB.

D.    The Appeals Council

Basil did not file her request for review to the Appeals Council on time, but the Council found good reason for the delay and considered Basil's arguments on the merits.  The Council, however, found no reason to review the ALJ's decision and, on July 24, 2007, denied Basil's request for review.   A.R. at 7-9.  Thus, the decision of the ALJ became the final agency decision.  On August 23, 2007, Basil filed her timely Complaint (d/e 1).

E.    Supplemental Evidence

Basil submitted a Global Assessment of Functioning (GAF) Scale
with her Motion for Summary Judgment in order to clarify and support
arguments made in her Brief.  Brief in Support of Plaintiff's Motion for
Summary Judgment (d/e 12), Ex. 1.

ANALYSIS

A claimant is entitled to benefits if he or she establishes an inability to
engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to last
for a continuous period of not less than 12 months.  This Court reviews the
ALJ's decision to determine whether it is supported by substantial
evidence, and the undersigned may not re-weigh evidence, resolve
conflicts in the record, decide questions of credibility or substitute my own
judgment for that of the ALJ.  Young v. Barnhart, 362 F.3d 995, 1001 (7th
Cir. 2004).  Substantial evidence is "such relevant evidence as a
reasonable mind might accept as adequate" to support the decision.
Richardson v. Perales, 402 U.S. 389, 401 (1971).  The Court must accept
the ALJ's findings if they are supported by substantial evidence and may
not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d

79, 82 (7th Cir. 1986). The ALJ must, however, at least minimally articulate her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).   The Court must be able to "track" the analysis to determine whether the ALJ considered all of the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Basil seeks reversal of the Commissioner's decision, asserting that the ALJ erred by (1) substituting her opinion for that of Basil's treating physicians; (2) failing to consider a variety of Basil's impairments without explanation and misstating evidence; and (3) using Basil's reported daily activities to conclude that she could perform substantial activity.  As set forth below, Basil's arguments are unavailing.

Basil asserts that the ALJ erred in substituting her opinion for that of Dr. Benning and Dr. Gelber.  Both Benning and Gelber qualify as treating sources under 20 C.F.R. § 404.1520.  A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record.  20 C.F.R. § 404.1527(d)(2); see also White v. Barnhart, 415 F.3d 654, 658 (7th Cir. 2005).

As the Court has previously noted, in October 2004, Dr. Gelber completed an SSA Listing of Impairments, indicating that Basil met Listing § 1.02 based on major dysfunction of a joint.  A.R. at 370-73.  In April 2006, Dr. Gelber completed another SSA Listing of Impairments, indicating that Basil satisfied the definition of § 1.00B2b for Loss of Function and opining that the level at which Basil could perform sustained work was "[l]ess than sedentary."  A.R. at 381-85.  The ALJ specifically stated that these opinions were not given controlling weight because they were not accompanied by medical findings to support the conclusions.  A.R. at 19.  The record supports this conclusion.

The Court turns first to the October 2004 form.  Listing § 1.02 defines major dysfunction of a joint as follows:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in

inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  First, as the ALJ correctly noted, the October 2004 Listing failed to identify the affected joint.  There is nothing in the record to support a finding that Basil had the inability to perform fine and gross movements effectively; thus, the ALJ's decision that she failed to satisfy § 1.02(B) is supported by the record.  Similarly, the record evidence is inconsistent with a finding of involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, such that Basil would satisfy § 1.02(A).  Appendix 1 expressly provides as follows:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B(2)(b)(2).  On the same day

that he indicated that Basil satisfied § 1.02, Gelber noted that Basil was walking with a cane and that her gait was steady.  A.R. at 352.  A few months prior, in June 2004, Dr. Chapa noted that Basil could ambulate up to fifty feet on a flat surface without a cane.  A.R. at 315-18.  In July 2004, Dr. Gelber noted that Basil's gait was steady and her strength was normal.  A.R. at 353.  Nearly a year after the October 2004 form was completed, in July 2005, Basil reported that she was able to stand and walk for a quarter to a half an hour before the pain became unbearable.  A.R. at 433.  At this time, Gelber again described her gait as "steady."  Id.  It was not until January 2006, when Basil complained of difficulty walking with her cane, that Gelber, noting Basil's gait was slow with her cane, referred Basil for evaluation for a motorized scooter or wheelchair.  A.R. at 429.  However, when Basil returned in late March or early April 2006, Gelber characterized her gait as steady with her cane and noted that Basil's strength and reflexes were normal.  A.R. at 428.

Soon after this assessment, Gelber completed the April 2006 Listing form, in which he indicated that Basil satisfied the definition of inability to ambulate effectively as follows:

> an extreme limitation of the ability to walk; i.e., an impairment(s)
> that interferes very seriously with the individual's ability to

> independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B(2)(b)(1).  The Court notes that the April 2006 Listing form does not indicate that Basil meets any specific listed impairment, but rather that Basil satisfies the definition of Loss of Function as used in § 1.00 of Appendix 1, which applies to the musculoskeletal impairments generally.  Moreover, the opinion that Basil satisfied the definition of inability to ambulate effectively is inconsistent with Gelber's contemporaneous notes that Basil's gait was steady with a cane. The Court further notes that shortly thereafter, in August 2006, Dr. Benning characterized Basil's gait as "coordinated and smooth."  A.R. at 392. Gelber's opinion is not supported by medically acceptable clinical or laboratory diagnostic evidence, but rather appears to be based entirely on Basil's representations that she has difficulty walking.

Finally, Gelber characterized the level of sustained work that Basil was able to perform as "less than sedentary."  A.R. at 385.  On the form that Gelber used, sedentary work was defined as "a capacity to sit for at least 6 hours in an 8-hour workday and to lift up to 10 pounds maximum.

The ability to walk and stand up to approximately 1/3 of the workday

(2-3 hours per 8-hour day) is also implied . . . ."  Id.  The record is devoid of

medically acceptable clinical or laboratory diagnostic evidence to support

the finding that Basil could perform sustained work only at a less than

sedentary level.  In fact, immediately prior to stating this opinion, Gelber

noted that Basil's gait was steady with her cane and her strength and

reflexes were normal.  The ALJ did not err in failing to give Dr. Gelber's

opinions controlling weight.

On October 10, 2006, Dr. Benning completed an SSA Listing of

Impairments, indicating that Basil satisfied § 1.04, noting that Basil's

degenerative disease of the cervical and lumbar spine together with her

fibromyalgia prevented her from effectively walking any distance.  A.R. at

421-25.  Benning opined that Basil could not stand, lift, or walk for even

one hour at a time, and that she could sit for only one hour at a time.  A.R.

at 423.  According to Benning, Basil could sit up to two hours in an

eight-hour day, but could not stand, lift, or walk for even one hour.  Id.

Benning placed restrictions on Basil's ability to work as follows: no work at

unprotected heights, no work around moving machinery, no exposure to

marked changes in temperature and humidity, no driving of automotive

equipment, and no exposure to dust, fumes, or gases.  A.R. at 424.

Benning opined that the level at which Basil could preform sustained work

was "[l]ess than sedentary."  A.R. at 425.  Again, sedentary work was

defined as "a capacity to sit for at least 6 hours in an 8-hour workday and to

lift up to 10 pounds maximum.  The ability to walk and stand up to

approximately 1/3 of the workday (2-3 hours per 8-hour day) is also implied

. . . ."  Id.

The ALJ declined to give Dr. Benning's conclusions controlling weight

after finding that the opinions were based entirely on Basil's subjective

complaints and were not supported by objective medical evidence or even

a stated awareness of Basil's daily activities.  The ALJ did, however,

incorporate restrictions on climbing, working at unprotected heights, and

prolonged walking into her analysis of Basil's residual functional capacity.

The ALJ did not err in failing to give the remainder of Dr. Benning's opinion

controlling weight.  Clearly, the conclusion that Basil was unable to walk is

not supported by Benning's treatment notes, which consistently throughout

2006 characterize Basil's gait as  "coordinated and smooth."  A.R. at 391-

92, 395.  Moreover, the record lacks clinical or

laboratory diagnostic evidence to support the remainder of Benning's conclusions.  Basil's first claim of error fails.

Basil next asserts that the ALJ failed to consider a variety of her impairments without explanation and misstated or ignored evidence.  First, Basil contends that the ALJ erred when she failed to elaborate on her finding that Basil's urinary incontinency, arthritis, muscle cramps, migraines, vertigo, peptic ulcer and muscle/joint pain were not severe impairments.  Secondly, Basil asserts that the ALJ failed to account for her cervical radiculopathy, which caused numbness in her right arm, and for her documented muscle spasms.  Basil further contends that the ALJ erroneously equated stability with ability to perform substantial gainful activity.  Finally, Basil asserts that the ALJ failed to adequately account for her mental impairments.

An ALJ need not discuss every piece of evidence but must at least minimally discuss evidence that contradicts the Commissioner's decision to allow the Court to track the ALJ's reasoning and be assured that the ALJ considered all of the relevant evidence.  Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000).  First, there is no record evidence to contradict the ALJ's assessment that Basil's urinary incontinency, arthritis, muscle

cramps, migraines, vertigo, peptic ulcer and muscle/joint pain were not severe impairments.  The Court turns next to the limitations alleged from the cervical radiculopathy and the pain arising out of the muscle spasms. In the instant case, the ALJ found Basil to be less than credible. Specifically, the ALJ determined that Basil's allegations regarding the severity of her pain and limitations were inconsistent with other record evidence.  Given this assessment, the ALJ also discounted medical evidence that was based solely on Basil's subjective complaints.  The Court can clearly track this decision, and it does not constitute grounds for reversal.  Basil's argument relating to  the ALJ's alleged misstatement of the evidence that her condition was often characterized as stable is similarly unavailing.  It is clear from the ALJ's opinion that the ALJ did not interpret notations of stability to mean anything more than a lack of change in Basil's condition.

With respect to mental impairments, the ALJ concluded that Basil should be limited to routine and repetitive jobs due to moderate problems with concentration, persistence, and pace due to depression and anxiety. The ALJ further found that Basil exhibited slight limitations in daily and social activities.  A.R. at 24.  As Basil correctly points out, in July 2004, Kirk

Boyenga, Ph.D, assessed Basil with moderate restriction of activities of
daily living and mild difficulties in maintaining social functioning.  A.R. at
297.  The ALJ expressly disagreed with Boyenga and clearly explained that
she based her finding of only slight limitations on Basil's ability to live
independently and to participate in school activities and organizations.
A.R. at 24.  The ALJ stated that this additional evidence was the basis for
her failure to adopt the assessments of DDS consultant Dr. Boyenga.
Again, the Court can track this analysis.

Basil asserts that the ALJ erred in failing to expressly consider GAF
scores for Basil ranging from 40 to 50.  In October 2005 and February
2006, treating Dr. Maher noted GAFs of 50 for Basil.  A.R. at 456-57.  In
July 2006, an individual treatment plan developed by a licensed clinical
social worker noted that Basil had a GAF of 40.  A.R. at 417.  The GAF
scale submitted by Basil reveals that an individual with a GAF of 40
evidences some impairment in reality testing or communication or major
impairment in several areas such as work or school, family relations,
judgement, thinking or mood.  According to the scale, a GAF of 41 to 50
evidences serious symptoms (e.g., suicidal ideations) or serious
impairment in social, occupational, or school functions.  Basil asserts that

the ALJ erroneous failed to explain how Basil could perform substantial

gainful activity in light of such scores.  The ALJ did not expressly address

the GAF scores in her opinion.  This alone does not necessitate reversal,

as the ALJ need not discuss each piece of evidence, but must minimally

articulate her analysis of all relevant evidence.  Herron, 19 F.3d at 333.  In

the instant case, the ALJ considered Basil's mental impairments,

specifically noting review of Dr. Maher's treatment notes.  She considered

in sufficient detail evidence that contradicted the GAF scores, including

evidence concerning Basil's ability to attend and perform well in college

classes and to deal with other people as the president of a college

organization.  Again, the ALJ's conclusion that Basil was only slightly

limited in her daily and social activities and moderately limited in

concentration and attention are supported by substantial evidence.

Finally, Basil argues that the ALJ erred in using Basil's reported daily

activities to conclude that she could perform substantial gainful activity.

The Seventh Circuit has expressly recognized that a person's ability to

engage in sporadic physical activities such as household chores and

grocery shopping is fundamentally different from the ability to maintain

full-time employment, eight hours a day five consecutive days of the week.

Carradine v. Barnhart, 360 F.3d 751, 755-56 (7th Cir. 2004).  The ALJ

expressly recognized this principle.  A.R. at 22.  Nevertheless, the inquiry

into daily activities is certainly relevant to Basil's ability to perform basic

work activities.  The ALJ determined that the totality of Basil's activities

demonstrates that she is able to perform a limited range of light and

sedentary work.  At the time of the hearing, Basil was attending college full

time and was for the most part getting good grades.  Basil could perform a

variety of self-care and household tasks, and in 2005, she had traveled to

Florida for a two-week visit.  All of this evidence is relevant to the

determination of Basil's residual functional capacity as well as the

assessment of her credibility as it relates to her pain and limitations.  The

ALJ did not err in considering it.

## CONCLUSION

THEREFORE, as set forth above, Basil's claims of error fail.  The

ALJ's decision that Basil was not disabled is supported by the law and by

substantial evidence.  The Commissioner of Social Security's Motion for

Summary Judgment (d/e 15) is ALLOWED.  Plaintiff Toby Basil's Motion for

Summary Judgment (d/e 11) is DENIED.  The decision of the

Commissioner of Social Security is AFFIRMED.  All pending motions are

denied as moot.  THIS CASE IS CLOSED.

IT IS THEREFORE SO ORDERED.

ENTER:   July 21, 2008

                    FOR THE COURT:

                                        *s/ Byron G. Cudmore*
                    _____
                                BYRON G. CUDMORE
                    UNITED STATE MAGISTRATE JUDGE